No. 14-1651

———————————————————

UNITED STATES COURT OF APPEALS
FOR THE FIRST CIRCUIT

————————————

NINA SHERVIN, M.D.
Plaintiff-Appellant,

v.

PARTNERS HEALTHCARE SYSTEM, ET AL.,
Defendants-Appellees.

————————————

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

———————————————————

BRIEF OF AMICUS CURIAE AMERICAN CIVIL LIBERTIES UNION OF
MASSACHUSETTS, CHARLES HAMILTON HOUSTON INSTITUTE FOR RACE AND
JUSTICE, MASSACHUSETTS EMPLOYMENT LAWYERS ASSOCIATION,
MASSACHUSETTS LAW REFORM INSTITUTE, JEWISH ALLIANCE FOR LAW
AND SOCIAL ACTION, UNION OF MINORITY NEIGHBORHOODS
AND GAY & LESBIAN ADVOCATES & DEFENDERS
ON BEHALF OF PLAINTIFF-APPELLANT, NINA SHERVIN, M.D.
SUPPORTING REVERSAL

———————————————————

Nancy Gertner, Esq.
1525 Massachusetts Avenue
Langdell 328
Cambridge, MA 02138
617.496.4099

Nina Joan Kimball, Esq.
Kimball Brousseau LLP
One Washington Mall
7th Floor
Boston, MA 02108
617.367.9449

Emma Quinn-Judge, Esq.
Zalkind Duncan & Bernstein LLP
65A Atlantic Avenue
Boston, MA 02110
617.742.6020

Michaela May, Esq.
Law Office of Michaela C. May
400 Massachusetts Avenue
Suite B
Arlington MA 02474
617.863.6529

Attorneys for Amici Curiae

TABLE OF CONTENTS

Table of Contents...........................................i

Table of Authorities......................................iii

Corporate Disclosure Statement.............................1

Interest of Amici Curiae...................................1

Introduction...............................................8

Relevant Facts.............................................9

Argument..................................................12

I.    The District Court Misapplied the Continuing
      Violation Doctrine under State Law .................12

      A.   The Continuing Violation Doctrine Under State
           Law Is Not Limited To Hostile Environment Claims 14

           1.   Language of the rule........................15

           2.   Historically the rule has been
                broadly applied ...........................15

           3.   Cuddyer and subsequent decisions did not limit
                the rule to hostile environment claims.......17

      B.   Under the Continuing Violation Rule, an Employee
           Need Not File a Claim Until She Knows the
           Situation is Hopeless and Unlikely to Improve ...18

           1.   The Cuddyer test...........................18

           2.   Probation is not a discrete act in the
                Context of this case.......................20

           3.   Initial probation decision was an
                equivocal act..............................20

      C.   The District Court Improperly Instructed the
           Jury, Failing to Allow the Jury to Determine
           If a Continuing Violation Occurred and Requiring
           That There Be Conduct Within Limitations Period

That "Standing Alone" Violated the Statute .......23

    1.  District Court should have allowed jury
        To determine whether a continuing
        Violation occurred .........................23

    2.  If not a continuing violation, conduct
        outside the limitations period can form
        the basis for liability, but not damages.....24

    3.  District Court improperly required a single
        act within limitations period that "standing
        alone" violated the statute.................25

II.  Plaintiffs Seeking to Vindicate Their Rights
    Under Title VII and Related Laws Must Be
    Permitted a Full and Fair Opportunity to
    Put Forward Their Cases............................26

    A.  Statements Showing Direct Retaliatory
        Animus Are Highly Probative and Must
        Be Admitted......................................29

    B.  Evidence of Pretext Is Highly Probative
        and Must Be Admitted............................33

    C.  Employment Plaintiffs Must Be Permitted
        to Use Circumstantial Evidence and
        Courts Should Not Take an Unduly
        Restrictive View of Such Evidence...............36

## TABLE OF AUTHORITIES

CASES                                                          PAGE(S)

Aman v. Cort Furniture Rental Corp., 85 F.3d 1074
(3d Cir. 1996).................................................28

Altshuler v. Animal Hosps., Ltd., 901 F. Supp. 2d 269
(D. Mass. 2012)...............................................32

Ayash v. Dana-Farber Cancer Inst., 443 Mass. 367 (2005).......32

Borne v. Haverhill Golf & Country Club, Inc.,
58 Mass. App. Ct. 306 (2003).........................17, 19, 24

Carter v. Comm'r of Correction, 43 Mass. App. Ct.
212 (1997)................................................16, 18

Clifton v. MBTA, 62 Mass. App. Ct. 164 (2004).................17

Clifton v. MBTA, 445 Mass. 611 (2005)........................17

Conway v. Electro Switch Corp., 825 F.2d 593
(1st Cir. 1987)...............................................37

Cuddyer v. Stop & Shop Supermarket Co.,
434 Mass. 521 (2001)..................................17, passim

Currier v. United Techs. Corp., 393 F.3d 246
(1st Cir. 2004)...............................................37

DeCaire v. Mukasey, 530 F.3d 1, 18 (1st Cir. 2008) ...........26

Desert Palace, Inc. v. Costa, 539 U.S. 90 (2003)..............38

Diaz v. Jiten Hotel Mgmt., 762 F. Supp. 2d 319
(D. Mass. 2011).........................................33, 38

Diaz v. Jiten Hotel Mgmt., Inc., 671 F.3d 78
(1st Cir. 2012)...............................................17

Doe v. Claiborne County, 103 F.3d 495
(6th Cir. 1996)...............................................33

Estes v. Dick Smith Ford, Inc., 856 F.2d 1097
(8th Cir. 1988)...............................................28

Goguen v. Allen, No. 13-2278, 2015 WL 1064394
(1st Cir. Mar. 12, 2015)......................................31

Heimeshoff v. Hartford Life & Accid. Ins. Co., 134
S. Ct. 604 (2013)..........................................18

Hodgens v. Gen. Dynamics Corp., 144 F.3d 151
(1st Cir. 1998)............................................28

Hollander v. Am. Cyanamid Co., 895 F.2d 80
(2d Cir. 1990).............................................28

Johnson v. Gen. Elec., 840 F.2d 132 (1st Cir. 1988)...........21

LeBlanc v. Great Am. Ins. Co., 6 F.3d 836
(1st Cir. 1993)............................................38

Lipchitz v. Raytheon Co., 434 Mass. 493 (2001)................37

Lynn Teachers Union, Local 1037 v. MCAD,
406 Mass. 515 (1990).......................................16

Mack v. Great Atl. & Pac. Tea Co., 871 F.2d 179
(1st Cir. 1989)............................................17

MacCormack v. Boston Edison Co., 423 Mass. 652 (1996).........37

McDonnell Douglas Corp. v. Green, 411 U.S. 805 (1973).........26

McDonough v. City of Quincy, 452 F.3d 8
(1st Cir. 2006)............................................29

Meritor Sav. Bank v. Vinson, 477 U.S. 57 (1986)...............15

Mortimer v. Atlas Distr. Co., 15 MDLR 1233 (1993).............16

Muñoz v. Sociedad Española De Auxilio Mutuo y
Beneficiencia de P.R., 671 F.3d 49 (1st Cir. 2012)............28

Nat'l R.R. Passenger Corp. v. Morgan, 536 U.S. 101
(2002).....................................................14

Ocean Spray Cranberries, Inc. v. MCAD, 441 Mass. 632
(2004).....................................................17

Palter v. Merchants Ins. Group, 2 MDLR 1136 (1980)............21

iv

Price Waterhouse v. Hopkins, 490 U.S. 228 (1987)...............28

Rathbun v. Autozone, 361 F.3d 62 (1st Cir. 2004)...............35

Reeves v. Sanderson Plumbing Prods., Inc.,
530 U.S. 133 (2000)...................................30, 31, 34

Riordan v. Kempiners, 831 F.2d 690 (7th Cir. 1987)............40

Rock v. MCAD, 384 Mass. 198 (1981)............................15

Rogers v. EEOC, 454 F.2d 234 (5th Cir. 1971),
cert. denied, 406 U.S. 957 (1972).............................15

Sabree v. United Bhd of Carpenters & Joiners,
Local No. 33, 921 F.3d 396 (1st Cir. 1990)....................25

Simas v. First Citizens' Fed. Credit Union, 170 F.3d 37
(1st Cir. 1999)...............................................31

Sullivan v. Liberty Mut. Ins. Co., 444 Mass. 34 (2005)........34

Thomas v. Eastman Kodak Co., 183 F.3d 38 (1st Cir. 1999)...21, 22

Tobin v. Liberty Mut. Ins. Co., 553 F.3d 121 (1st Cir. 2009) ..26

Travers v. Flight Servs. & Sys., Inc., 737 F.3d 144
(1st Cir. 2013)...............................................30

Tuli v. Brigham & Women's Hosp., 656 F.3d 33
(1st Cir. 2011)...............................................19

United States v. Candelaria-Silva, 162 F.3d 698
(1st Cir. 1998)...............................................33

Wards Cove Packing Co. v. Atonio, 490 U.S. 642 (1989).........27

Wheatley v. Am. Tel. & Tel. Co., 418 Mass. 394 (1994).........21


STATUTES

42 U.S.C. § 1983..............................................31

Civil Rights Act of 1991, Pub. L. No. 102-166,
105 Stat. 1071 (1991).........................................27

G.L. c. 151B.................................................15, passim

G.L. c. 151B, §4(16A).......................................15

Statutes 1986, c. 588, § 3..................................15


RULES

804 C.M.R § 1.10(2).........................................15

Fed. R. App. P. 29..........................................1, 2


LAW REVIEW ARTICLES

Deborah L. Brake, "Retaliation," 90 Minn. L. Rev. 18
(2005)......................................................22

Michael Zimmer, Slicing & Dicing of Individual
Disparate Treatment Law, 61 La. L. Rev. 577 (2001)..........38


OTHER MATERIALS

Association of American Medical Colleges, 2014
Specialty Data Book, https://members.aamc.org/eweb/
upload/14-086%20Specialty%20Databook%202014_711.pdf.........22

## CORPORATE DISCLOSURE STATEMENT

The Amici, the American Civil Liberties Union of Massachusetts, the Charles Hamilton Houston Institute for Race and Justice at Harvard Law School, the Massachusetts Employment Lawyers Association, the Massachusetts Law Reform Institute, the Jewish Alliance for Law and Social Action, the Union of Minority Neighborhoods, and the Gay & Lesbian Advocates & Defenders are nonprofit organizations that have no parent corporations and do not issue stock.

## INTEREST OF AMICI CURIAE[1]

Amici Curiae are organizations dedicated to the promotion of civil rights, workplace rights and equal opportunity. They frequently advocate for and/or represent low income clients and clients with meritorious civil rights and discrimination claims, and view vigorous enforcement as a critical tool necessary to give meaning to the laws that protect Massachusetts residents from unlawful discrimination in employment. They have long worked to eradicate invidious discrimination in this Commonwealth.

---

[1] This brief is conditionally submitted pursuant to Fed. R. App. P. 29, subject to leave of court. None of the parties' counsel has authored this brief in whole or in part. Neither the parties nor their counsel have contributed money that was intended to fund the preparation or submission of the brief. No persons other than the Amici Curiae, their members, or their counsel have contributed money or services that were intended to fund the preparation or submission of the brief.

1

Amici submit this brief pursuant to Fed. R. App. P. 29 to urge this Court to vacate the judgment below and remand this case for a new trial.

The Statements of Interest of the individual Amici Curiae are set forth below:

### AMERICAN CIVIL LIBERTIES UNION OF MASSACHUSETTS

The American Civil Liberties Union of Massachusetts ("ACLUM") is a non-profit organization of over 22,000 members and supporters, affiliated with the national ACLU, and dedicated to the principles of liberty and equality embodied in the state and federal constitutions and civil rights laws. ACLUM has long participated in cases addressing the societal purpose of eradicating invidious discrimination in employment, among other areas.  ACLUM has a strong interest in ensuring that employees are able to bring discrimination claims where there has been a long pattern of discriminatory conduct and that they are able to prove their claims through relevant, probative evidence in order to assist in eradicating discrimination in the Commonwealth.

### CHARLES HAMILTON HOUSTON INSTITUTE FOR RACE AND JUSTICE

The Charles Hamilton Houston Institute for Race and Justice at Harvard Law School ("CHHIRJ") was launched in September 2005 by Charles J. Ogletree, Jr., Jesse Climenko Professor of Law. The Institute honors and continues the unfinished work of Charles Hamilton Houston, one of the 20th century's most

2

important legal scholars and litigators. Houston engineered the
multi-year legal strategy that led to the unanimous 1954 Supreme
Court decision, *Brown v. Board of Education,* 347 U.S. 483
(1954), repudiating the doctrine of "separate but equal" schools
for black and white children. By facilitating a continuous
dialogue between practitioners and scholars, he ensured that
legal scholarship would resonate outside the academy, and that
new legal strategies would be immediately incorporated into the
training of lawyers.

CHHIRJ uses this model to address contemporary civil rights
challenges *in* our increasingly multi-racial society. Its long
term goal is to ensure that every member of our society enjoys
equal access to the opportunities, responsibilities and
privileges of membership in the United States. CHHIRJ is
committed to using research, instruction and advocacy directed
to the judicial, legislative and executive branches of
government, with a consistent and particular emphasis on
securing racial fairness and equality. Through its research and
litigation, CHHIRJ addresses issues of disparity and racial
justice, both on the national and local levels. It is of
critical importance to CHHIRJ's work that civil rights laws
designed to eradicate discrimination remain vital remedial

tools, and critical among these is the right to protection from retaliation against those who pursue their rights.

## THE MASSACHUSETTS EMPLOYMENT LAWYERS ASSOCIATION

The Massachusetts Employment Lawyers Association ("MELA") is a voluntary membership organization of more than 175 lawyers who regularly represent employees in labor, employment, and civil rights disputes in Massachusetts. MELA is an affiliate of the National Employment Lawyers Association (NELA), a membership organization with 69 circuit, state and local affiliates and more than 4,000 lawyers who regularly represent employees in such disputes. NELA is the largest organization in the United States whose members litigate and counsel individuals, employees, and applicants with claims arising out of the workplace. As part of its advocacy efforts, MELA has filed numerous Amicus Curiae briefs in employment matters involving state anti-discrimination law, singly or jointly with other Amici. The interest of MELA in this case is to protect the rights of its members' clients by ensuring that courts properly apply the continuing violation rule under state law and that the courts apply the proper standards for admitting relevant, probative evidence of discrimination.

## MASSACHUSETTS LAW REFORM INSTITUTE

The Massachusetts Law Reform Institute is a statewide non-profit legal services organization whose mission is to advance

economic, racial and social justice through legal action,
education and advocacy. MLRI specializes in legal initiatives
and systemic reforms that help low-income individuals and
families to preserve economic stability and to remove barriers
to upward economic mobility. For over 40 years, MLRI has been
the backbone of the Massachusetts civil legal aid system and is
considered one of the premier impact advocacy and poverty law
support centers in the country. MLRI has represented clients,
including group clients, in both the federal and state courts on
issues of interest to those seeking to end discrimination in
employment, housing and benefits programs.  MLRI has a strong
interest in ensuring that the state's anti-discrimination law is
properly interpreted to allow employees to file timely claims
where there has been a pattern of discriminatory conduct and to
have the opportunity to present relevant evidence in support of
their claims of discrimination.

## THE JEWISH ALLIANCE FOR LAW AND SOCIAL ACTION

The Jewish Alliance for Law and Social Action (JALSA) is a
Boston-based human rights organization inspired by Jewish
teachings and values and committed to social justice, civil
rights, and civil liberties.  JALSA members provided key
leadership in the efforts to pass the initial Massachusetts
anti-discrimination legislation and the establishment of a state
agency to carry out that legislation.   JALSA members have

worked for many years in the struggle for civil rights for all
Americans drafting and encouraging passage of anti-
discrimination laws for all members of the community and
participating as *amici* in federal and state cases where
essential civil rights protections are at risk.   JALSA has also
worked to promote policies to eliminate discrimination through
litigation, legislation, and public education.   JALSA sees
protection for individuals not to be retaliated against when
they oppose discriminatory practices as an essential component
of the protection of civil rights.

### UNION OF MINORITY NEIGHBORHOODS

The Union of Minority Neighborhoods ("UMN") is a Boston
based community organization founded in 2002 to increase
activism, empowerment, and opportunity in communities of color.
UMN provides skills training to community activists and
technical assistance to community based organizations in a
number of areas, including housing, employment, CORI reform,
economic development, and voting rights.   UMN has organized and
led successful coalitions that include labor organizational non-
profits, government agencies, and businesses, to address issues
that directly affect communities of color, including issues of
discrimination in employment, housing, and the making and
enforcement of contracts.   UMN's efforts are designed to

strengthen our democracy and re-build communities of color. In these efforts, it is of critical importance to UMN that the laws enacted to secure equal rights and opportunities remain meaningful tools in the eradication of discrimination in this Commonwealth.  Interpreting the continuing violations doctrine in a way that disregards the way in which discrimination occurs in many workplaces, and that deprives employees of the right to seek redress for such conduct, undermines G. L. c. 151B's statutory protections against discrimination and retaliation to the detriment of communities UMN serves.

## GAY & LESBIAN ADVOCATES & DEFENDERS

Founded in 1978, Gay & Lesbian Advocates & Defenders (GLAD) is New England's leading public interest legal organization dedicated to ending discrimination based on sexual orientation, HIV status and gender identity and expression. GLAD has litigated widely in New England in both state and federal courts in all areas of the law in order to protect and advance the rights of lesbians, gay men, bisexuals, transgender individuals and people living with HIV and AIDS.

GLAD's history includes litigating and providing amicus support in a wide range of anti-discrimination and employment matters.  See, e.g., Muzzy v. Cahillane Motors, 749 N.E.2d 691 (Mass. 2001) (amicus brief addressing appropriate

7

level of specificity of jury instruction on "reasonable person" standard in same-sex sexual harassment case); <u>Melnychenko v. 84 Lumber Co.</u>, 424 Mass. 285, 676 N.E.2d 45 (1997) (amicus brief arguing that same-sex sexual harassment is prohibited by Chapter 151B regardless of the sexual orientation of the parties); <u>Bragdon v. Abbott</u>, 524 U.S. 624 (1998) (establishing that people with HIV are protected under the Americans with Disabilities Act); <u>Rosa v. Park West Bank & Trust Co.</u>, 214 F.3d 213 (1st Cir. 2000) (holding that transgender person denied opportunity to apply for loan may state sex discrimination claim under Equal Credit Opportunity Act); <u>Bedford v. N.H. Community Tech. College Sys.</u>, Nos. 04-E-229, 04-E-230, 2006 WL 1217283 (N.H. Super. Ct. May 3, 2006)(holding that denying family benefits to employees with same-sex partners violated prohibition against employment discrimination based on sexual orientation).  GLAD has an enduring interest in ensuring that employees receive full and complete redress for the violation of their civil rights in the workplace.[2]

## **INTRODUCTION**

Discrimination is a complex phenomenon, often a series of incidents, typically subtle, that over time culminates in an adverse action. While there is rarely direct evidence of

---

[2] The authors wish to thank Colette Irving, an attorney with MLRI, for her research in support of this brief.

discrimination, this case is different.  Here there was direct evidence, much of it excluded by the District Court.  The Court's rulings, from summary judgment, carving out conduct that was clearly part of a continuing violation, through its evidentiary rulings excluding statements showing animus, to its instructions, which fundamentally muddled the state law of discrimination, made the proof impossible.  In ruling after ruling, the trial judge skewed the evidence in favor of the defendants, creating precedent that, if sustained, dramatically undercuts the effectiveness of Title VII and Chapter 151B.  We offer this amicus brief because of our concern that without fair enforcement, these laws that clear obstacles to women's advancement, will be undermined.

## RELEVANT FACTS

On February 2, 2007, Dr. Nina Shervin was placed on probation after she failed to conform to a gender stereotype: she did not break down in tears when the Residency Director, Dr. Herndon, found fault with her performance, which made him believe she was "guilty." A-3967; EX-184; EX-17-19; A-2709. Herndon placed Shervin on probation because she did not react emotionally according to his stereotype of a woman. She complained of gender bias to Dr. Rubash, Chief of Orthopaedic Surgery, who warned her not to file a discrimination claim, saying "litigation would not turn out well for her." A-4590-91.

9

Her complaint of bias unleashed a campaign of retaliation that derailed her medical career.

Shervin sought internal review, appealing to the Executive Committee in March 2007.  In June, the EC affirmed the probation, but assured Shervin that "probation is not considered an adverse action." A-4105-06; EX-027; EX-115.  When Shervin's supporter, Dr. Burke, questioned the decision to extend probation, he was told to be careful because Herndon would "strike back." A-4301-02.  Another member of the EC told Burke to warn Shervin: "Nina needs to realize that she's a woman in a man's specialty; she needs to get her head screwed on straight and suck it up." A-4305-06.  The bias message could not have been clearer.

From February 2007 to 2008, Herndon engaged in a pattern of gathering information critical of Shervin and humiliating her, which one doctor referred to as a "witch hunt." EX-027. He had residents fill out "critical incident forms" to record criticisms of Shervin.  A-2874-77.  Over the summer of 2007, Herndon and Rubash gathered information to (as Rubash said) "put[] together a case against" her.  A-3631-32; A-3657-58; A-4894.

In summer 2007, Shervin expressed concerns about gender bias and retaliation to Dr. Nancy Tarbell, head of women's careers at MGH.  EX-027; EX-030-31; EX-407-08.

While in September 2007, things began to look more hopeful, any improvement was shortlived. The EC ended probation, though Herndon dissented, recommending she be fired. A-4114-16. Herndon was removed as her supervisor; Shervin was again assured that probation was internal and would not affect her future; and her evaluations through to graduation were positive.  A-2477.

But the respite was temporary; the discriminatory and retaliatory conduct continued. On June 25, 2008, a junior resident on Shervin's team sent an email to Herndon critical of Shervin.  Though Herndon knew the resident had the facts wrong, he nevertheless sent the email to the EC.  EX-244; A-3260; A-3372. Several weeks later, the EC invited this resident and another to its meeting where the residents criticized Shervin. A-4203; 4208-09.

On June 18, 2008, Shervin learned that because she did not mention probation, her application for medical license was deemed incomplete, against all assurances she had been given. A-4650-51; EX-045.  In August she received a limited license precisely because of the probation. A-4650-52.  She immediately initiated the formal grievance process to have the probation expunged.

But the limited license, the probation and the bias of her former supervisors continued to dog her even when she sought to change jobs.  In fall 2008, there was an opening for an

orthopaedist at MGH/Newton Wellesley Hospital.  Shervin gave her
CV to the doctor in charge of the search who wanted to consider
Shervin for other positions, but Rubash claimed there were no
vacant positions. In July 2009, Rubash was not supportive of
hiring Shervin at MGH/Newton Wellesley. A-3751-55. In June 2012,
a job offer was withdrawn by a hospital in merger talks with
MGH.  MGH's CEO Peter Slavin could not have been more explicit
about retaliatory animus: "[T]here's not a court in the land
that can force me to hire Dr. Shervin back."  A-1511; A-4070-74;
A-4123.  In spring 2012, a job offer at Milton Hospital was
withdrawn because of this lawsuit.  A-4178; A-4191-2; A-1545-6.
Those acts were a culmination of a campaign that had begun in
February 2007, with her initial complaint of gender bias.

### ARGUMENT

## I.  The District Court Misapplied the Continuing Violation Doctrine Under State Law.

What is at stake in this case could not be more critical to
discrimination law.  The issue is one that confronts any
employee who is a minority in her workforce, whether she is a
professional woman in a non-traditional occupation like Shervin,
or a low-wage earner, worried that if she complains about
discrimination, she may lose her job or derail her career.  When
must she file a claim of discrimination at the Massachusetts
Commission Against Discrimination or lose her right to do so?

12

The District Court ruled that Shervin should have filed after she was initially placed on probation, despite assurances that probation was not an adverse action and had no negative effects at that time.  According to the Court, that failure meant that the acts between February 2007 and June 5, 2008 could not be part of a continuing violation and were "barred … from being a basis of any liability."  The ruling at worse misapplied state law; the instructions at best muddied the principles.

Our state continuing violation rule encourages an employee to wait to file at the MCAD until she feels her situation is "hopeless" and "unlikely to improve."  This has important benefits for employees and employers alike and avoids the too early or too late dilemma.  An employee need not race to the MCAD at the first inkling of discrimination, and risk the retaliation that may well follow.  Nor is she out of luck if she waits to exhaust internal attempts to resolve her situation.

Here Shervin was discouraged from taking legal action and assured that the probation would not affect her future.  She filed when she was supposed to file, after experiencing negative consequences of the probation. The Court refused to apply the continuing violation rule to Shervin's sex discrimination and retaliation claims, finding, as a matter of law, that it was restricted to hostile environment claims. As such, the Court penalizes Dr. Shervin for trying to work through internal

13

channels, precisely what the state law and the law's rationale reject.

### A. The Continuing Violation Doctrine Under State Law Is Not Limited To Hostile Environment Claims.

The District Court in its summary judgment order misapplied the state continuing violation rule by improperly narrowing it to hostile environment claims.  The Court erroneously stated that after the Supreme Court's decision in <u>National R.R. Passenger Corp. v. Morgan</u>, 536 U.S. 101 (2002), the state and federal rules are "much closer" and "at least coextensive" and that "even under state law, this doctrine concerns the hostile work environment claims."  ADD-058-059. They are not.  State courts and the MCAD have long applied the continuing violation rule to a broad range of discriminatory acts that form a pattern of discriminatory conduct. Indeed, that the rule applies outside of the hostile environment area is apparent from the language of the rule, its history, and the way it has been applied.

The MCAD's position makes sense.  Discrimination is a complex phenomenon, particularly in a professional setting.  It masquerades first as a negative reaction to a woman's complaint about her working conditions; it builds over successive decisions in the work place; it culminates in an adverse action, as here.  There is no conceptual reason to distinguish hostile

14

environments from discrimination and retaliation in general;
more important, it is not the law.

### 1. Language of the rule.

The continuing violation rule is part of the MCAD's own
regulations, providing: the 300-day "requirement shall not be a
bar to filing in those instances where facts are alleged which
indicate that the unlawful conduct complained of is of a
continuing nature." 804 C.M.R. §1.10(2). The regulation refers
broadly to "unlawful conduct."  Nowhere does it distinguish
between different forms of discrimination or distinguish
"discrete acts" from harassment.

### 2.  Historically the rule has been broadly applied.

The MCAD enacted the continuing violation rule in 1961.
See Rock v. MCAD, 384 Mass. 198, 206 (1981).  That was long
before the Legislature amended Chapter 151B to prohibit sexual
harassment in 1986, see Statutes 1986, c. 588, §3, inserting
G.L. c. 151B, §4(16A), and long before federal courts recognized
hostile work environment claims.  According to the Supreme
Court, the first case to recognize a cause of action based upon
a discriminatory work environment occurred in 1971.  See Meritor
Sav. Bank v. Vinson, 477 U.S. 57, 65 (1986)(citing Rogers v.
EEOC, 454 F.2d 234 (5th Cir. 1971)).

Thus, at the time the rule was adopted it applied to
discrimination other than hostile environment, as that type of

claim had not yet been recognized.  An early MCAD decision
applies the continuing violation rule to a course of action
alleging denial of promotion, position elimination, transfer and
termination. <u>Palter v. Merchants Ins. Group</u>, 2 MDLR 1136, 1145-
52 (1980)(separation from employment "although achieved by a
series of discrete events, may in fact be an ongoing or
continuing process, which is legally cognizable as a continuing
violation"); <u>see</u> <u>Mortimer v. Atlas Distr. Co.</u>, 15 MDLR 1233,
1249-50 (1993)(handicap claim based on transfer, denial of
accommodation, termination).  An early Supreme Judicial Court
decision applied the continuing violation rule to a policy that
denied teachers seniority credit for retirement benefits when
they had been forced to resign due to maternity leave.  <u>Lynn
Teachers Union v. MCAD</u>, 406 Mass. 515 (1990).

    The rule applies broadly precisely because discrimination
is often comprised of different forms of interrelated conduct.
The "'theory recognizes that some acts are imbricated, i.e.,
they involve an interlinked succession of related events or a
fully-integrated course of conduct. Although the limitations
clock generally starts with the commission of a discriminatory
act, a true "continuing violation" rewinds the clock for each
discriminatory episode along the way.'" <u>Carter v. Comm'r of
Correction</u>, 43 Mass. App. Ct. 212, 220 (1997) (retaliation based

on series of disciplinary actions and harassment) (quoting <u>Mack v. Great Atl. & Pac. Tea Co.,</u> 871 F.2d 179, 183 (1st Cir. 1989)).

### 3. <u>Cuddyer</u> and subsequent decisions did not limit the rule to hostile environment claims.

<u>Cuddyer v. Stop & Shop Supermarkets Co.</u>, 434 Mass. 521 (2000), and subsequent decisions did not limit the state continuing violation rule to claims of hostile work environment. See <u>Clifton v. MBTA</u>, 445 Mass. 611, 616 (2005)("finding no basis to except a claim of retaliation … from the proper scope of the continuing violation doctrine."); <u>Ocean Spray Cranberries, Inc. v. MCAD</u>, 441 Mass. 632 (2004)(denial of reasonable accommodation). "[I]t is the nature of the unlawful conduct alleged by the plaintiff, independent of the precise formulation of his claim, that allows a plaintiff to invoke an exception to the limitations period for a continuing violation." <u>Clifton</u>, at 617. See <u>Diaz v. Jiten Hotel Mgt, Inc.</u>, 671 F.3d 78, 85–86 (1st Cir. 2012)(denial of pay raise); <u>Borne v. Haverhill Golf & Country Club, Inc.</u>, 58 Mass. App. Ct. 306, 311–12 (2003) (sex discrimination claim based on years of inequitable membership, rules and access to golf course).

And when disciplinary conduct is intertwined with harassing conduct, as here, Massachusetts courts have applied the continuing violation rule. See <u>Clifton v. MBTA</u>, 62 Mass. App. Ct. 164, 172 (2004)(retaliation and hostile environment claim

involved "more stringent supervision, harsher discipline, and fewer working privileges"), <u>aff'd in part</u> 445 Mass. 611 (2005); <u>Carter</u>, 43 Mass. App. Ct. at 213-17 (warnings, suspension and harassing conduct).

**B. Under the Continuing Violation Rule, an Employee Need Not File a Claim Until She Knows the Situation is Hopeless and Unlikely to Improve.**

Ordinarily, a statute of limitations begins to run when the cause of action "accrues," which occurs when the plaintiff can file suit and obtain relief. <u>Heimeshoff v. Hartford Life & Accid. Ins. Co.</u>, 134 S.Ct. 604, 610 (2013). However, the Supreme Court has recognized that statutes of limitations do not inexorably commence upon accrual. <u>Id</u>. Indeed Massachusetts makes that explicit, acknowledging that there are circumstances when a plaintiff has become aware of a discriminatory event, but the statute of limitations is not yet triggered.

**1. The <u>Cuddyer</u> test.**

The SJC in <u>Cuddyer</u> parted company with the federal revelatory rule under which an employee had to file a claim as soon as she "had notice that she had an actionable claim," <u>id.</u> at 539-40, finding that it leads to results that are "fair neither to the employee, who may be forced prematurely to choose litigation as a remedy, nor to the employer, who has a legitimate interest in attempting to resolve allegations of harassment short of time-consuming

18

and expensive litigation." Id. at 538. Instead, the SJC
adopted a test "more favorable to a plaintiff, [that]
focuses on the plaintiff's knowledge of the hopelessness of
her work environment, and allows her to litigate alleged,
otherwise time-barred, acts of sexual harassment unless her
delay in initiating the lawsuit, considered under an
objective standard, was unreasonable." Id. at 540.
Under this test, a plaintiff need not file until she knows
that her "work situation [is] pervasively hostile and
unlikely to improve," meaning that her situation has become
"hopeless." Id. at 539-40.

     The SJC's formulation of the rule serves important policy
objectives that benefit employers and employees alike by "not
penaliz[ing] victims of discrimination for reporting misconduct
as it occurs and attempting to work with their employers to
remedy the situation." Tuli v. Brigham & Women's Hosp., 656 F.3d
33, 41 (1st Cir. 2011); see Borne, 58 Mass. App. Ct. at 312
("[f]requently, a person who suffers discriminatory conduct may
hope that the situation will improve," and "take measures so
that women at the Club were treated equally. With that in mind,
and so as not to encourage premature discrimination complaints,
persons may, starting with the first observed act of
discrimination, reset the limitations clock with each new act of
discrimination.").

**2. Probation is not a discrete act in the context of this case.**

In its summary judgment decision, the District Court erroneously determined probation was a "discrete act" and not part of a larger pattern of incidents forming a fully-integrated course of discriminatory conduct. In fact, the probation decision initiated a pattern of discriminatory and retaliatory conduct against Shervin, what one witness characterized as a "witch hunt." It included Herndon encouraging residents to fill out critical incident forms against Shervin; Herndon and Rubash gathering information to "put[] together a case against" her; Herndon recommending that she be fired; and, within the filing period, Herndon forwarding a resident's criticism of Shervin to the EC; Shervin receiving the limited license; and Rubash discouraging MGH from hiring Shervin.

**3. Initial probation decision was an equivocal act.**

Because the consequences of the probation decision were neither known nor felt until August 2008, the initial probation decision was at best an equivocal act that did not trigger a duty to file. The SJC has recognized that a "'discharge' notice that offers the possibility of other employment within the company [is] an equivocal termination notice which does not trigger the commencement of the limitations period for filing an employment discrimination claim" because it did not place the

plaintiff on unequivocal notice of termination.  Wheatley v. Am.
Tel. & Tel. Co., 418 Mass. 394, 397-98 (1994).  Applying the
rule in Ocean Spray to the equivocal act of failure to respond
to an accommodation request, the SJC ruled the limitations
period "begins to run at the point thereafter when the employee
knew or reasonably should have been aware that the employer was
unlikely to afford him a reasonable accommodation." 441 Mass. at
645.  That is, the situation had become hopeless.

Shervin's situation is similar to Thomas v. Eastman Kodak
Co., 183 F.3d 38 (1st Cir. 1999), where this Court recognized
that where low performance evaluations were used years later as
the basis for layoff, the limitations period ran not when the
evaluations were provided, but only when "'the implications [of
the evaluation] have crystallized' and 'some tangible effects of
the discrimination were apparent to the plaintiff,' i.e., if
'the plaintiff is aware that he will in fact be injured by the
challenged practice.'"  Id. at 50 (quoting Johnson v. Gen.
Elec., 840 F.2d 132, 136-37 (1st Cir. 1988)).

Shervin was entitled to work through internal channels to
improve her situation. By September 2007 when probation was
lifted, Herndon removed as her supervisor, and receiving
assurances that probation would not affect her future, Shervin
reasonably could expect her situation would improve. Her
situation was not hopeless until she actually received a limited

medical license, at which point she immediately filed a grievance, entered into a tolling agreement, and filed her claim.  Filing earlier would have been premature.  See Thomas, 183 F.3d at 50 (discrimination claims may not be ripe for adjudication until discriminatory evaluations are actually applied and injury occurs).

Requiring Shervin to have filed a claim challenging the initial probation decision turns a blind eye to the realities of how vulnerable a woman is in a predominantly male profession.[3] Complaints by women and minorities who do not have the support of institutional powerbrokers are more likely to result in retaliation.[4]  When Shervin first complained, Rubash warned her against filing, saying "litigation would not turn out well." She was warned that Herndon would "strike back," and told that she "needs to realize that she's a woman in a man's specialty; she needs to get her head screwed on straight and suck it up."

This Court should apply the continuing violation rule to Shervin's claims of sex discrimination and retaliation such that

---

[3] In 2013 only 4.6% of active physicians and 13.7% of residents in orthopedic surgery were women. AAMC's 2014 Physician Data Specialty Book, https://members.aamc.org/eweb/upload/14-086%20Specialty%20Databook%202014_711.pdf

[4] See Deborah L. Brake, "Retaliation," 90 Minn. L. Rev. 18, 36, 39 (2005) ("When women and persons of color identify and object to discrimination, however, they are perceived as transgressing the social order, setting in motion a dynamic that sets the stage for retaliation… Retaliation is more likely to occur against vulnerable employees who lack the support of organizational powerbrokers.").

all the conduct beginning in February 2007 is timely and can be considered for *both* liability and damages.

**C. The District Court Improperly Instructed the Jury, Failing to Allow the Jury To Determine if a Continuing Violation Occurred and Requiring that There Be Conduct Within Limitations Period That "Standing Alone" Violated the Statute.**

**1. District Court should have allowed jury to determine whether a continuing violation occurred.**

Whether a continuing violation occurred is a question of fact for the jury; instead the Court instructed them that only conduct "standing alone" within the limitations period was actionable. Cuddyer requires the jury to determine whether conduct within the filing period is related to conduct prior to the filing period that forms a pattern of discriminatory and retaliatory conduct. 434 Mass. at 541 ("The jury will first decide whether the plaintiff has shown the existence of a continuing violation that includes conduct occurring within the six months prior to her filing with the MCAD."). If the jury does so find, then the conduct prior to the filing period together with the conduct within the filing period can be used as the basis for liability and damages. Id. at 541-42 ("if the jury find that the plaintiff has met the standard stated above, then conduct outside the limitations period would be open to them for an award of damages."). Plaintiff is only barred from seeking damages for conduct prior to the filing period if she

23

"knew or reasonably should have known her work situation was pervasively hostile and unlikely to improve." <u>Cuddyer</u>, at 539; <u>Borne</u>, 58 Mass. App. Ct. at 312 (applying <u>Cuddyer</u> standard to years of related inequitable treatment).

## 2. If not a continuing violation, conduct outside the limitations period can form the basis for liability, but not damages.

Even if the conduct outside the limitation period were not part of a continuing violation, it could still provide background and context for understanding later discriminatory acts (within the limitation period). That rule is especially critical here. The earlier acts against Shervin enable the fact finder to understand the significance of the later ones: who the players are, why they behaved as they did, what the parties' history was.

But the damage calculation, however, can only date from conduct that was within the limitations period. <u>Cuddyer</u> states this clearly: "If the jury concludes that the plaintiff has not met this [continuing violation] standard, then events prior to the limitations period would be barred as providing a basis for the recovery of damages." 434 Mass. at 541. However, such untimely conduct "may be used as background evidence to establish a hostile work environment, even though she may not recover damages for the time-barred events." <u>Id.</u> at 530 n.10

24

(citing <u>Sabree v. United Bhd of Carpenters & Joiners, Local No. 33</u>, 921 F.3d 396, 400 n.9 (1st Cir. 1990)).

The District Court's instruction to the jury fundamentally misstated <u>Cuddyer</u>. The Court first stated that conduct prior to the limitations period was "barred as a matter of law from being *a basis of any liability*," taking the language of Cuddyer, but substituting the phrase "any liability" for the phrase "recovery of damages," a critical error. At the same time the Court said such conduct could be considered "for the limited purpose of background evidence (i.e., as it may, for example, bear upon motive, intent or context) as to her timely discrimination and retaliation claims." A-1803, A-5089. The Court misstated the law and confused the jury by saying they were "barred as a matter of law" from considering this evidence for liability; yet permitting the jury to consider it for "background evidence."

### 3. District Court improperly required a single act within limitations period that "standing alone" violated the statute.

The District Court compounded its error by instructing the jury that to find an adverse action within the filing period, it had to find an act that "standing alone" caused damage. To the contrary, when viewing a pattern of discriminatory conduct that is comprised of many incidents, the jury is entitled to look at the totality of the circumstances. "Workplace conduct is not

25

measured in isolation… but must be judged by looking at all the circumstances." <u>Clark Co. Sch. Dist. v. Breeden</u>, 532 U.S. 268, 270 (2001) (internal quotes omitted).  As the SJC ruled, a plaintiff need only "show one incident of sexual conduct which, standing alone might not necessarily support her claim, but which substantially relates to earlier incidents of abuse and substantially contributes to the continuation of a hostile work environment."  <u>Cuddyer</u>, at 533; see <u>Tobin v. Liberty Mut. Ins. Co.</u>, 553 F.3d 121, 142 (1st Cir. 2009) (evidence outside limitations period could support liability in failure to accommodate case); <u>DeCaire v. Mukasey</u>, 530 F.3d 1, 18 (1st Cir. 2008) (time-barred transfer "cannot be used as a basis to award relief but can be used as background in support of later claims of gender discrimination").

## II.  Plaintiffs Seeking to Vindicate Their Rights Under Title VII and Related Laws Must Be Permitted a Full and Fair Opportunity to Put Forward Their Cases.

As the Supreme Court explained in <u>McDonnell Douglas Corporation v. Green</u>, 411 U.S. 792 (1973), a plaintiff must be afforded "a full and fair opportunity to demonstrate by competent evidence that the presumptively valid reasons for [the employer's action] were in fact a coverup for" discrimination or retaliation.  <u>Id.</u> at 805.  The trial court here denied Shervin this opportunity by excluding evidence on two central issues: animus and pretext.  First, the court excluded two statements by

26

individuals professing an unwillingness to hire Shervin <u>because</u> <u>of</u> this lawsuit; a jury could find that such statements reflected unlawful retaliatory animus.  Second, the court excluded evidence that Defendants' explanation for not hiring Shervin was false; in other words, the court excluded evidence from which the jury could infer pretext.  These rulings were inconsistent with longstanding precedent and, because they concern evidence central to a plaintiff's case, upholding these rulings would, at worst, undermine future discrimination claims, and at best, sow confusion.

A plaintiff seeking to prove discrimination or retaliation faces a structural problem: the employer typically controls the individuals and information that a plaintiff needs to make her case.  Accordingly, plaintiffs require "broad access to employers' records in an effort to document their claims." <u>Wards Cove Packing Co. v. Atonio</u>, 490 U.S. 642, 657 (1989), <u>superseded in part by statute</u>, Civil Rights Act of 1991, Pub. L. No. 102-166, 105 Stat. 1071.  Even after an employee obtains the information she needs to prove her claim, she must confront a substantial hurdle.  At trial, an employer's witnesses offer direct testimony denying the employee's allegations.  The plaintiff, however, has to "face the difficult task of persuading the fact-finder to disbelieve an employer's account

of its own motives." Estes v. Dick Smith Ford, Inc., 856 F.2d 1097, 1103 (8th Cir. 1988), overruled in part on other grounds by Price Waterhouse v. Hopkins, 490 U.S. 228 (1989).

Forty years after McDonnell Douglas, "[t]he sophisticated would-be violator has made" it "a little more difficult" to analyze employment claims. See Aman v. Cort Furniture Rental Corp., 85 F.3d 1074, 1082 (3d Cir. 1996). "Because employers rarely leave a paper trail-or 'smoking gun'-attesting to a discriminatory intent, disparate treatment plaintiffs often must build their cases from pieces of circumstantial evidence which cumulatively undercut the credibility of the various explanations offered by the employer." Hollander v. Am. Cyanamid Co., 895 F.2d 80, 84-85 (2d Cir. 1990) (internal quotation marks and citations omitted); see Hodgens v. Gen. Dynamics Corp., 144 F.3d 151, 172 & n.13 (1st Cir. 1998) (similar). Viewed as a whole, these pieces of evidence "form a mosaic that is enough to support" a plaintiff's claim, see Muñoz v. Sociedad Española De Auxilio Mutuo y Beneficiencia de P.R., 671 F.3d 49, 56 (1st Cir. 2012), but absent key evidence, a plaintiff cannot create a complete picture.

**A. Statements Showing Direct Retaliatory Animus Are Highly
   Probative and Must Be Admitted.**

A plaintiff alleging retaliation must prove a causal
connection between her "protected activity" and the employer's
adverse action.  See, e.g., McDonough v. City of Quincy, 452
F.3d 8, 17 (1st Cir. 2006).  In Shervin's case, this means
showing that Defendants' adverse actions – which included
denying Shervin at least three hiring opportunities – were
causally connected to her employment discrimination claim.
The trial court excluded two statements directly on point.
First, the court excluded statements by Mark Gebhardt, M.D., a
Harvard and BIDMC-affiliated surgeon, who initiated the search
for an orthopaedic surgeon to work at Milton Hospital as a joint
employee of BIDMC and Harvard.  Gebhardt told Milton CEO Joseph
Morrissey, that he opposed hiring Shervin because she was suing
Gebhardt (in Gebhardt's capacity as a Harvard Executive
Committee member).  ADD-123; Dkt.461; Dkt.446; A-4000-08; A-
4178; A-4191—92.  Indeed, Gebhardt went so far as to threaten
that should Milton independently employ Shervin, BIDMC would
withdraw its support for a planned center at Milton.  A-1545-46.
Second, in the context of a different hiring opportunity where
contracts were put before Shervin and then withdrawn, the court
excluded a statement by MGH CEO Peter Slavin, M.D., that

"there's not a court in the land that can force me to hire Shervin back."  A-1511; A-4070-91.

These statements comprised strong, even direct, evidence of Defendants' retaliatory animus.  They are not oblique: they are about Shervin and her litigation and they show that Defendants were unwilling to hire Shervin because of her litigation; Gebhardt, moreover, expressed not only reluctance to hire Shervin, but a willingness to punish another entity should it do so against his wishes.  Gebhardt and Slavin were both in positions to make or influence the relevant hiring decisions. EX-244; Dkt. 461; Dkt. 446; A-1545-46; A-3145-46; A-4000-08; A-4178; A-4191-92.  See Travers v. Flight Servs. & Sys., Inc., 737 F.3d 144, 147 (1st Cir. 2013) ("A CEO sets the tone and mission for his subordinates, many of whom presumably consider it an important part of their jobs to figure out and deliver what the CEO wants.").

Moreover, these are precisely the kinds of statements courts have relied on as evidence of animus in other cases. Notably, in Reeves v. Sanderson Plumbing Products, Inc., 530 U.S. 133 (2000), the Supreme Court admonished the Fifth Circuit for disregarding relevant remarks in an age case.  The Court criticized the Fifth Circuit for ignoring the comment, by an individual who was in a position to participate in the relevant termination decision, that the plaintiff "was too damn old to do

[his] job." Id. at 151-52.  Convert this comment from the age
context to the retaliation context and it becomes, roughly: "she
was too litigious to get this job," a remark very similar to
those at issue in this case.  Indeed, this Court recently
concluded that a correctional officer's statement to an inmate
that the officer would "'do whatever it takes in my personal
power to make sure you spend the rest of your time in"
administrative segregation was direct evidence of the officer's
retaliation for the inmate's grievances under 42 U.S.C. § 1983.
See Goguen v. Allen, No. 13-2278, 2015 WL 1064394, at *15 (1st
Cir. Mar. 12, 2015).  Likewise, here, Gebhardt conveyed a
willingness to do whatever was in his power to ensure that
Shervin did not get a job.

    Reeves and Goguen are not isolated examples.  See, e.g.,
Travers, 737 F.3d at 145, 146-47 (CEO's statements to
plaintiff's supervisor to "get rid of" plaintiff and to tell
plaintiff to drop his FLSA lawsuit, and CEO's repeated
complaints about the amount of money plaintiff's lawsuit was
costing the employer were direct, highly probative, retaliation
evidence); Simas v. First Citizens' Fed. Credit Union, 170 F.3d
37, 48 (1st Cir. 1999) (statement by plaintiff's supervisor
admonishing him for "stirring [up]" investigation into
suspicious commercial loan and threatening to terminate
plaintiff's employment if plaintiff continued pushing for an

audit constituted direct evidence that plaintiff's termination was retaliatory under Federal Credit Union Act); Altshuler v. Animal Hosps., Ltd., 901 F.Supp.2d 269, 276 (D.Mass. 2012) (letter stating that employee was terminated for complaining about untimely deposits to IRA was direct evidence in ERISA retaliation claim); Ayash v. Dana-Farber Cancer Inst., 443 Mass. 367, 388-89 (2005) (statements by plaintiff's team leaders that proceeding with litigation would "hurt" her and that the employer would "squash [her] like a bug" were evidence of retaliation).  Upholding the trial court's evidentiary exclusion here would fundamentally undermine substantial legal precedent.

The trial court's rationale for excluding the Slavin evidence was astonishing.  The court agreed with Defendants that Slavin's statement was "extraordinarily prejudicial."  A-4087-90.  Such evidence is, of course, highly prejudicial.  If believed by the jury it is sufficient to establish retaliatory animus; a jury could also use this evidence to find pretext, because it casts doubt on the credibility of an employer's proffered explanation. Indeed, this evidence is prejudicial in the same sense that fingerprint evidence linking a defendant to a murder weapon or eyewitness testimony against a criminal defendant is prejudicial: if believed by the jury, it weighs strongly against the defendant.  "That this evidence logically casts the defendant[] in an unfavorable light is not, ipso

facto, a reason to exclude it. All evidence presented by a party opponent, is prejudicial to the other side, to a greater or lesser degree." Doe v. Claiborne County, 103 F.3d 495, 515 (6th Cir. 1996); cf. Diaz v. Jiten Hotel Mgmt., Inc., 762 F.Supp.2d 319, 337 (D.Mass. 2011) ("The use of racially, sexually, or ageist offensive language is necessarily prejudicial, precisely because it is highly probative."). The rule "protects a defendant against unfair prejudice, not against all prejudice." United States v. Candelaria-Silva, 162 F.3d 698, 705 (1st Cir. 1998).

Evidence that reflects an individual's intent is, while rare, exactly the evidence the jury must examine. To be sure, a defendant can and will rebut and contextualize such evidence. But a plaintiff should not face a defendant's direct denials of animus while being barred from putting in direct admissions of animus. Evidence of retaliatory animus is central to an employment claim and as such, must be admitted.

**B. Evidence of Pretext Is Highly Probative and Must Be Admitted.**

Pretext is central to an employment plaintiff's proof of discrimination or retaliation. A jury's conclusion that the employer's proffered explanation for its actions is false – meaning, that it is a pretext – is sufficient to establish

liability.  See Reeves, 530 U.S. at 147; Sullivan v. Liberty
Mut. Ins. Co., 444 Mass. 34, 40 (2005).

Shervin offered evidence that she understood there to be a
plan to bring her onto the medical staff at MGH.  The Vice Chair
of MGH's Department of Orthaepedics, Joseph McCarthy, M.D., who
was generally involved in hiring for such positions, accepted
her curriculum vitae and Shervin took steps consistent with
securing a position.  Shervin was subsequently informed by Chief
of MGH Orthopaedics, Harry Rubash, M.D., that MGH would not hire
her because there were no vacant positions.  EX-153; EX-157; EX-
158; A-1291; A-3399-3402; A-4652-55.

Shervin sought to show that her hiring would have been
consistent with MGH's informal hiring practices.  The trial
court excluded evidence that McCarthy, the individual who
accepted her CV, "was on the same page" as Shervin concerning
her hire.  EX-398; A-4339-50.  The trial court also excluded the
proffered testimony of John Siliski, M.D., an orthopaedist in
private practice at MGH.  Siliski would have testified that
Rubash conferred with him about a fellow Siliski had worked with
and both men agreed it would be good to hire the fellow,
notwithstanding the lack of a vacant position at the time;
Rubash told Siliski to confer with Andrew Freiberg, M.D., Vice
Chair of MGH's Department of Orthopaedics and Chair of its
Arthoplasty Service, and Freiberg responded that the fellow

34

could not be hired <u>because of</u> Shervin's lawsuit.  A-2140-41; A-3995-96; A-4129-33; A-4713-15; A-4802-03.  The court excluded the evidence, deeming the Siliski testimony irrelevant and the McCarthy evidence inadmissible on agency grounds.[5]  A-4133; A-3762-64; A-4808-09; ADD-117; A-3866; A-4229-4351.

The jury could have inferred from the excluded evidence that MGH's proffered explanation for its decision not to hire Shervin, that there was no vacancy, was false.  The exclusion of this evidence, and in particular the exclusion of the Siliski evidence as irrelevant because it was unrelated to a discrete position Shervin sought, sharply narrows the evidence a plaintiff may use to prove pretext.  Where, as here, an employer asserts that it acted consistent with its policy or practice, a plaintiff can establish pretext by showing that the defendant has no such policy or practice or routinely disregards its purported policy or practice.  To make this showing, however, a plaintiff must look beyond her own experience.  <u>See, e.g.</u>, <u>Rathbun v. Autozone</u>, 361 F.3d 62, 72 (1st Cir. 2004) (evidence of "differential treatment" can support pretext).

---

[5] While beyond the scope of this brief, it is difficult to understand how the trial court could conclude that McCarthy, despite having authority to conduct an employment search on behalf of MGH, was not, in the trial court's view, an agent speaking on a matter related to one within the scope of his agency when he offered insight into MGH hiring practices.

What makes the evidence in this case unusual, and its exclusion therefore particularly pernicious, is that the evidence not only undercuts MGH's explanation for not hiring Shervin, but it shows MGH's awareness that its explanation was pretext.  Had Siliski testified, the jury could have found that MGH made its decision not to hire Siliski's fellow in order to maintain the plausibility of its explanation <u>in this lawsuit</u>. The proffered evidence was not that Siliski's fellow could not be hired because MGH had no open position; it was that despite an inclination to hire the fellow informally, MGH could not do so because doing so would expose MGH's explanation for not hiring Shervin as false.  This Court should conclude that excluding such evidence of pretext is reversible error.

**C.  Employment Plaintiffs Must Be Permitted to Use Circumstantial Evidence and Courts Should Not Take an Unduly Restrictive View of Such Evidence.**

The trial court's errors in excluding animus and pretext evidence were compounded by the exclusion of categories of circumstantial evidence widely used in employment cases, including:

- evidence that other women were contemporaneously experiencing discrimination and retaliation by the same individuals;

36

- evidence that a male who stood up for women faced
  retaliation; and

- evidence that gender representation at MGH compared
  unfavorably to other institutions.

Pl.'s Br. 61-67.  See, e.g., Conway v. Electro Switch Corp., 825
F.2d 593, 597 (1st Cir. 1987) ("evidence of a corporate state-
of-mind or a discriminatory atmosphere is not rendered
irrelevant by its failure to coincide precisely with the
particular actors or time frame involved in the specific events
that generated a claim of discriminatory treatment"); MacCormack
v. Boston Edison Co., 423 Mass. 652, 664 (1996) ("In the absence
of direct proof of retaliation, a plaintiff may introduce
relevant evidence such as the demonstration of a general
practice and policy of retaliation"); see also Currier v. United
Techs. Corp., 393 F.3d 246, 253 (1st Cir. 2004) (to be
admissible at trial, statistical evidence need not be
dispositive of ultimate issue, but need only "bolster[]"
plaintiff's claim); Lipchitz v. Raytheon Co., 434 Mass. 493,
508-09 (2001) (raw statistics admissible "because to the extent
they suggest that the highest ranks of an employer's
organization are closed to members of a protected class, they
may support an inference that the particular decision was

tainted by unlawful bias" and defendant is free to rebut with its own statistical evidence).[6]

Such circumstantial evidence is highly vulnerable to what at least one scholar calls "slicing and dicing," meaning the process by which discrete pieces of evidence are rejected as lacking sufficient probative value because, when viewed alone rather than in context, they are insufficient to support liability.  See Diaz, 762 F. Supp. 2d at 322 ("[W]hat the defendant would have this Court do is to … 'slice and dice' the complex phenomenon of discrimination into pieces, and evaluate each piece out of the context of the whole, the real, lived employment environment."); see Michael J. Zimmer, Slicing & Dicing of Individual Disparate Treatment Law, 61 La. L. Rev. 577 (2001); cf. Desert Palace v. Costa, 539 U.S. 90, 100 (2003) (criticizing tendency to undervalue circumstantial evidence in civil cases when "we have never questioned the sufficiency of circumstantial evidence in support of a criminal conviction, even though proof beyond a reasonable doubt is required").

Such slicing and dicing is particularly problematic where, as here, the exclusion of evidence was combined with lopsided

---

[6]  Although the trial court relied on LeBlanc v. Great American Insurance Co., 6 F.3d 836 (1st Cir. 1993), that case addressed whether a plaintiff's statistical evidence – standing alone – was sufficient to withstand summary judgment.  That such evidence alone is insufficient to support a discrimination verdict does not, of course, render it irrelevant.  Id. at 848-49.

evidentiary rulings that allowed in evidence that permitted one set of inferences to be drawn – those in favor of Defendants. For instance, the court permitted Defendants to introduce evidence that Thomas Gill, M.D., a witness who offered testimony helpful to Shervin, had experienced some difficulties in his employment at MGH, allowing the jury to infer that his testimony was infected by his own antipathy toward MGH. The court refused, however, to admit evidence that would have permitted the jury to infer that Gill's difficulties at MGH were a result of his speaking out for women. Pl.'s Br. 64-65. Likewise, when Chief of MGH Orthopaedics, Rubash, offered a positive spin on a Harvard report assessing MGH's diversity – thereby using the report to bolster his own testimony – Shervin was not permitted to impeach him with the content of the report. Pl.'s Br. 65-67; see also Pl.'s Br. at 15 n.9 (discussing lopsided admission of notes and communications).

   This Court should conclude that these evidentiary rulings, as well as the decisions to exclude animus and pretext evidence, substantially affected Shervin's rights. Upholding the trial court's rulings would dramatically reduce the evidence available to plaintiffs to prove pretext and intent, thereby raising the bar for plaintiffs who seek to vindicate their rights under Title VII, Chapter 151B, and similar laws.

> Proof of … discrimination is always difficult. Defendants of even minimal sophistication will neither admit discriminatory animus nor leave a paper trail demonstrating it; and because most employment decisions involve an element of discretion, alternative hypotheses … will always be possible and often plausible. The law tries to protect … workers against being treated more harshly than would be the case if they were of a different race, sex, religion, or national origin, but it has difficulty achieving this goal because it is so easy to concoct a plausible reason for not hiring, or firing, or failing to promote, or denying a pay raise to, a worker who is not superlative. A plaintiff's ability to prove discrimination indirectly, circumstantially, must not be crippled by evidentiary rulings that keep out probative evidence because of crabbed notions of relevance or excessive mistrust of juries.

Riordan v. Kempiners, 831 F.2d 690, 697-98 (7th Cir. 1987).

This Court should conclude that the trial court's evidentiary rulings constitute reversible error.

## CONCLUSION

For these reasons, Amici Curiae respectfully request that this Court vacate the judgment below and remand the case to the District Court for a new trial.

Dated: April 10, 2015                    On behalf of Amici Curiae,


                              /s/ Nancy Gertner_____
                              Nancy Gertner, Esq.
                              Bar No. 190140
                              1525 Massachusetts Avenue
                              Langdell 328
                              Cambridge, Mass. 02138
                              617.496.4099
                              ngertner@law.harvard.edu

                              /s/ Nina Joan Kimball_____
                              Nina Joan Kimball, Esq.
                              Bar No. 103705
                              Kimball Brousseau LLP

One Washington Mall, 7th Floor
Boston, MA 02108
617.367.9449
nkimball@kbattorneys.com

Emma Quinn-Judge, Esq.
Bar No. 1138229
Zalkind Duncan & Bernstein LLP
65A Atlantic Avenue
Boston, MA 02110
617.742.6020
Equinn-judge@zalkindlaw.com

Michaela May, Esq.
Bar No. 152971
Law Office of Michaela C. May
400 Massachusetts Avenue, Suite B
Arlington MA 02474
617.863.6520
Attorneymay@gmail.com

## CERTIFICATE OF COMPLIANCE

Pursuant to Fed. R. App. P. 32 (a)(5), I hereby certify that this brief uses 12-Point Courier New, a monospaced font, containing no more than 10 ½ characters per inch. Pursuant to Fed. R. App. P. 32 (a)(7)(B), I certify that the brief was prepared using Microsoft Word, and contains 8,518 words, including all citations but exclusive of all certificates of counsel, Table of Contents, Table of Authorities, and Corporate Disclosure Statement, according to that system's word count function.

Date: April 10, 2015                    /s/ Nina Joan Kimball
                                        Nina Joan Kimball

## CERTIFICATE OF SERVICE

I hereby certify that this brief, filed through the ECF system, will be sent electronically to the registered participants as identified on the Notice of Electronic Filing, and that paper copies will be sent to those indicated as non-registered participants on April 10, 2015:

Ellen J. Zucker

Burns & Levinson LLP
125 Summer Street
Boston, MA 02110

Herbert L. Holtz
Thomas A. Reed
Eugene J. Sullivan
Holtz & Reed, LLP
225 Friend Street
Boston, MA 02114

Rebecca J. Wilson
Sherry Y. Mulloy
Kiley M. Belliveau
Peabody & Arnold LLP
600 Atlantic Avenue
Boston, MA 02210

John P. Coakley
Stephen D. Coppolo
Murphy & Riley, P.C.
101 Summer Street, 2nd Floor
Boston, MA 02110

Edward F. Mahoney
Martin, Magnusen, McCarthy & Kenney
101 Merrimac Street
Boston, MA 02114

*/s/ Nina Joan Kimball*